Cedric JOHNSON, Plaintiff,

v.

George M. DALEY, M.D., Defendant,

and

United States of America, Intervenor.

No. 98–C–0518–C.

United States District Court,
W.D. Wisconsin.

Oct. 6, 2000.

David J. Harth, Foley & Lardner, Madison, WI, for Cedric Johnson.

Robert M. Hunter, Assist. Atty. General, Madison, WI, for George M. Daley, M.D.

Leslie Herje, Assist. U.S. Atty., Madison, WI, John Schumann, Trial Atty., U.S. Dept. of Justice, Civil Div., Washington, DC, for U.S.

## OPINION AND ORDER

CRABB, District Judge.

Plaintiff Cedric Johnson has challenged the constitutionality of the Prison Litigation Reform Act's limit on the amount of fees paid to prisoners' counsel but not to non-prisoners' counsel in successful civil rights cases. *See* 42 U.S.C. § 1997e(d)(2)-(3). Plaintiff is an inmate at Fox Lake Correctional Institution in Fox Lake, Wisconsin. He brought suit against defendant George M. Daley pursuant to 42 U.S.C. § 1983, contending that defendant Daley had denied him adequate medical care for his liver disease in violation of the Eighth Amendment by not allowing him to be evaluated for a liver transplant and by failing to authorize that his name be added to the transplant list. On January 6, 2000, a jury found defendant liable under the Eighth Amendment for the delay in plaintiff's receipt of a liver transplant and awarded plaintiff $10,000 in compensatory damages and $30,000 in punitive damages.

On February 7, 2000, plaintiff moved for an award of attorney fees, costs and out-of-pocket expenses pursuant to 42 U.S.C. § 1988(b) and Fed.R.Civ.P. 54(d). He requested $101,776.01, including $92,997.20 in attorney fees and $8,778.81 in costs,

arguing that he is entitled to such an award under § 1988(b) because he is a "prevailing party" under 42 U.S.C. § 1983. Acknowledging that this amount exceeds the permissible amount recoverable for attorney fees under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(d), plaintiff contends that § 1997e(d)'s limit on attorney fees violates the equal protection provision of the due process clause of the Fifth Amendment because it treats prisoners and non-prisoners differently without furthering any legitimate government interest. He challenges the constitutionality of the limit on attorney fee awards to 150% of the judgment, *see* § 1997e(d)(2), and the limit on a lawyer's hourly rate to 150% of the rate allowed for court appointed counsel in criminal cases under the Criminal Justice Act, *see* § 1997(e)(d)(3). In the event his challenge to § 1997e(d) is denied, plaintiff requests an award of $45,230.31, including $36,451.50 in attorney fees and $8,778.81 in costs, an amount within the limits of both the hourly rate and the total fee award imposed by § 1997e(d).

Because plaintiff is challenging the constitutionality of a United States statute, I notified the United States of that fact, as I must do pursuant to 28 U.S.C. § 2403. On June 12, 2000, I granted the motion of the United States to intervene, as required under § 2403(a). Defendant and the United States object to plaintiff's request for an award in excess of that allowed under § 1997(e). They contend that the attorney fee provision of the PLRA, *see* § 1997e(d), is constitutional because it is related rationally to the legitimate governmental ends of deterring frivolous prisoner lawsuits, reducing suits predicated on trivial harms and protecting the public fisc, reducing the likelihood of windfall awards and standardizing the fee rates between civil and criminal lawyers assisting indigent prisoners. (For convenience, I will refer to defendant and the United States together as "defendant" because of the significant overlap of their positions.)

Presently before the court is plaintiff's motion for attorney fees and costs. Jurisdiction is present. *See* 28 U.S.C. § 1331. I conclude that the Prison Litigation Reform Act's limit on attorney fees violates the Fifth Amendment's equal protection guarantees because the government's stated legitimate goals are not rationally related to § 1997e(d)'s differential treatment of successful prisoner civil rights plaintiffs and successful non-prisoner civil rights plaintiffs. I recognize that three courts of appeals have upheld the § 1997(e) limits on attorney fee awards, *see Hadix v. Johnson,* 230 F.3d 840 (6th Cir.2000); *Boivin v. Black,* 225 F.3d 36 (1st Cir.2000); *Madrid v. Gomez,* 190 F.3d 990 (9th Cir.1999); *see also Collins v. Montgomery County Board of Prison Inspectors,* 176 F.3d 679, 686 (3d Cir.1999),[1] *cert. denied,* 528 U.S. 1115, 120 S.Ct. 932, 145 L.Ed.2d 811 (2000) (en banc panel divided equally on constitutionality of provision limiting fees to 150% of judgment), and that federal statutes carry a presumption of constitutionality not easily overcome. Nevertheless, I cannot find in this legislative provision "a rational relationship to an independent and legitimate legislative end," *Romer v. Evans,* 517 U.S. 620, 633, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Although the government's stated interests are legitimate, the link between the classification at issue and the proffered interests is absent. Because § 1997e(d) fails to further any of the government's interests, the only explanation for Congress's differential treatment of civil rights plaintiffs subject to the fee cap and those not subject to the cap is invidious discrimination.

---

1. Under the law of the Third Circuit, decisions of a divided en banc court are entitled to no weight. *See Tunis Brothers Co., Inc. v. Ford Motor Co.,* 763 F.2d 1482, 1501 (3d Cir.1985), *vacated on other grounds,* 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986).

## OPINION

### A. *Prison Litigation Reform Act*

■ 42 U.S.C. § 1988(b) provides that "[i]n any action or proceeding to enforce a provision of section ... 1983 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" of bringing an action to enforce 42 U.S.C. § 1983. In determining the reasonableness of the fee under § 1988, the most critical factor is the degree of success obtained. *See Farrar v. Hobby,* 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). The Prison Litigation Reform Act, 42 U.S.C. § 1997e(d), limits a prisoner's ability to recover attorney fees in civil rights cases under § 1988. Section 1997e(d)(1)(A) provides that attorney fees may be awarded under § 1988 in a civil rights action brought by a prisoner only to the extent that the "fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a [civil rights] statute." Section 1997e(d)(2) requires that "a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant." Finally, § 1997e(d)(2) limits the award of attorney fees to 150% of the amount of the judgment and § 1997e(d)(3) limits the hourly rate of a prisoner's lawyer to 150% of the hourly rate allowed for court-appointed counsel in criminal cases under the Criminal Justice Act, 18 U.S.C. § 3006A.

### B. *Level of Review*

Although the Fifth Amendment does not contain an equal protection clause, the Supreme Court has held that the Fifth Amendment's due process clause prevents the federal government from "engaging in discrimination that is 'so unjustifiable as to be violative of due process.'" *Schlesinger v. Ballard,* 419 U.S. 498, 500 n. 3, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975) (quoting *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954)); *see also Turner v. Glickman,* 207 F.3d 419 (7th Cir.2000) (challenge under equal protection component of Fifth Amendment's due process clause).

■ The parties agree that the applicable level of review of § 1997e(d) is the rational basis standard because the challenged statutory provision does not implicate any fundamental rights, including access to the courts, *see Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (establishing right of access to the courts); or involve any suspect classifications, *see Zehner v. Trigg,* 133 F.3d 459, 463 (7th Cir.1997) (stating that argument that prisoners are suspect class is "completely unsupported"). Furthermore, every court to address the constitutionality of § 1997e(d) has applied the rational basis standard of review.

■ A statute survives rational basis scrutiny "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Under rational basis review, classifications "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). "A statute is presumed constitutional, and '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Heller,* 509 U.S. at 320, 113 S.Ct. 2637 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)). "[U]nder rational basis review ... the classification need not be the most narrowly tailored means available to achieve the desired end." *Zehner,* 133 F.3d at 463.

■ Despite the presumptions that attend rational basis review, the process is not simply a ministerial exercise. The relationship between the classification and the asserted goal cannot be "so attenuated

as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained. The search for the link between classification and objective gives substance to [equal protection guarantees]; it provides guidance and discipline for the legislature, ... and it marks the limits of our own authority." *Romer,* 517 U.S. at 632, 116 S.Ct. 1620 (striking down under rational basis review amendment to Colorado constitution that discriminated against group on basis of sexual orientation). "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 633, 116 S.Ct. 1620.

### C. *Governmental Interests*

#### 1. *Reducing frivolous lawsuits*

■ In defending the constitutionality of the PLRA's limit on recoverable attorney fees in prisoner cases, defendant's central argument is that § 1997e(d) was a reasonable response to Congress's determination that frivolous prisoner civil rights suits account for a significant proportion of all frivolous suits filed in federal court and that disincentives to filing such suits were necessary to protect the viability of the judicial system. Plaintiff does not contest the legitimacy of the government's interest in curtailing frivolous lawsuits. Instead, he argues that there is no rational relationship between § 1997e(d)'s disparity in treatment between prisoners and non-prisoners and the government's interest in reducing frivolous prisoner suits.

■ The Prison Litigation Reform Act "ushered in a new and far more restrictive era for prisoner litigation," creating "ga-

tekeeping mechanisms designed to keep frivolous suits out of the federal courts." *Walker v. O'Brien,* 216 F.3d 626, 628 (7th Cir.2000); *see also Lee v. Clinton,* 209 F.3d 1025, 1026 (7th Cir.2000) (stating in dicta that PLRA was intended to reduce number of frivolous suits filed by prisoners). A complaint is "frivolous" when the plaintiff cannot set out any claim that has a rational or arguable basis in law or fact. *See Neitzke v. Williams,* 490 U.S. 319, 322–23, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

■ Among the gatekeeping mechanisms added by the PLRA is the requirement that each prisoner must pay some portion of the civil filing fee in advance and pay the entire fee in installments thereafter. *See* 28 U.S.C. § 1915(b)(1). A second requirement is that the prisoner must exhaust all of the administrative remedies available to him *before* filing his law suit. *See, e.g., Perez v. Wisconsin Dept. of Corrections,* 182 F.3d 532, 534–5 (1999) (§ 1997e says that *"[n]o action shall be brought* with respect to prison conditions ... *until* such administrative remedies as are available are exhausted") (emphasis in *Perez* ). Once these hurdles are overcome, the court must screen the complaint and dismiss any portion that is legally frivolous, malicious, fails to state a claim upon which relief may be granted or seeks money damages from a defendant who is immune from such relief. *See* § 1915(e)(2)(B), § 1915A(b). This occurs "before docketing" or "as soon as practicable after docketing" and throughout the litigation process. *Id.* The case must also survive motions to dismiss and motions for summary judgment on issues including venue, personal jurisdiction, qualified immunity and the merits. "Thus, where a prisoner proceeds to trial, is successful, and is awarded attorney fees, his case by definition is not 'frivolous.' " *McLindon v. Russell,* No. CIV. A. C–1–95–676, 2000 WL 1221854, at *7 (S.D.Ohio June 15, 2000).

### a. Disincentives to prisoners

Defendant maintains that the attorney fee cap creates an economic disincentive for prisoners to file frivolous lawsuits. At the heart of defendant's argument is the idea that prisoners perform a cost-benefit analysis in deciding whether to file a lawsuit, weighing a variety of factors. Although it is reasonable to assume that a pro se prisoner does do this, it is irrational to conclude that he bases his decision on the distant possibility that at some future time, his presently non-existent lawyer might recover a smaller rather than a larger amount of fees. Such an assumption has no "footing in the realities of the subject matter addressed by the legislation." *Heller*, 509 U.S. at 321, 113 S.Ct. 2637. A prisoner may harbor hopes of a substantial monetary award (as do non-prisoner plaintiffs), but he has no reason to take into consideration the size of the fee award to his counsel. It is far more likely that the prisoner takes into consideration the immediate economic impact of giving up 20% of the greater of the average monthly deposits to his account or the average monthly balance in his account for the six months preceding the filing of his complaint, *see* § 1915(b)(1)(A) and (B), as well as the noneconomic consideration that if his suit is deemed frivolous he will be assessed one strike toward the maximum of three that will prevent him from filing any more suits without prepayment of the full filing fee except in the one situation in which he faces an imminent threat of serious physical injury. *See* § 1915(g).

Plaintiff does not challenge the PLRA's requirement that "a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against defendant." § 1997e(2). This provision reduces the amount of money that a *prisoner* may recover in a civil rights case. In contrast, the indigent prisoner's potential recovery is not affected whether his *attorney* recovers a substantial fee from defendant under § 1988 or recovers a smaller fee under the cap set forth by § 1997e(2)-(3). The attorney fee cap determines the extent to which a losing defendant is required to compensate an attorney who represents a successful prisoner civil rights plaintiff. Indigent prisoners are not responsible for attorney fees in § 1983 suits; therefore, they have no reason to consider attorney fees in determining whether litigation is worth the economic risk, as they do when they consider whether they can afford to pay the $150 fee to file a complaint required by § 1915(b). Although "the perceived problem [of frivolous prisoner lawsuits] is not obviously implausible," Congress's "solution is [not] rationally suited to address that problem." *Zehner*, 133 F.3d at 463. The scheme penalizes lawyers without affecting the decision making of prisoners that was Congress's goal.

It could be argued that prisoners may be dissuaded from filing lawsuits if they think they will have difficulty securing counsel because of the penalty § 1997e(d) imposes on the minuscule number of lawyers who succeed in obtaining damages for their indigent clients. However, the purported goal of the cap is to discourage *frivolous* cases, not all prisoner lawsuits. Because there is no chance of being appointed counsel in a frivolous case, the only prisoners affected are those who file meritorious complaints for whom the court cannot secure counsel because of the limited fees available to lawyers in such cases.

Two courts of appeals have upheld the constitutionality of § 1997e(d) against equal protection challenges relying on the government's interest in reducing frivolous lawsuits. *See Madrid*, 190 F.3d at 996; *Boivin*, 225 F.3d at 44. Both of those courts failed to address with any specificity the fit between the means that Congress chose (capping attorney fees) and the end that it sought to achieve (reducing frivolous prisoner litigation). In *Madrid*, 190 F.3d at 996, the Ninth Circuit held that the government's interest in reducing frivolous lawsuits and minimizing taxpayer costs associated with such suits was ration-

ally related to § 1997e(d)(3), stating "it is certainly conceivable that, because of significant potential gains and low opportunity costs, prisoners generally file a disproportionate number of frivolous suits as compared to the population as a whole. Such speculation is sufficient for a rational-basis examination; there is no need for evidence or empirical data." In *Boivin,* 225 F.3d at 44, the First Circuit upheld § 1997e(d)(2), concluding that the cap on attorney fees plays into a prisoner's calculus in determining whether to file suit or forces a prisoner to "assess likely outcomes with greater care before filing a suit." The court concluded,

> It suffices to say that the prison setting is sui generis, and Congress's choice to treat prisoners differently than non-prisoners is plainly justified by the idiosyncratic characteristics of that setting. Prisoners' living costs are paid by the public and prisoners have nowhere to go—a combination that gives them more free time than non-prisoners to pursue claims (whether or not valid). The problem of prisoner litigiousness is exacerbated by the nature of prison life, as inmates tend to egg each other on. This problem is further complicated by the constitutionally-protected right to a certain level of legal assistance, *see Bounds,* 430 U.S. at 828, 97 S.Ct. 1491. Experience has shown that these and other factors, acting in concert, encourage inmates to bring large numbers of insubstantial claims—or so Congress rationally could have thought.

*See also Hadix,* 230 F.3d at 844 (relying on the government's interests of reducing trivial lawsuits and protecting the public fisc); *Morrison,* 88 F.Supp.2d at 808 (concluding that § 1997e(d)(2) was similar to filing fee requirement that Sixth Circuit had upheld under rational basis test as disincentive for filing of frivolous claims by prisoners) (citing *Hampton v. Hobbs,* 106 F.3d 1281, 1286–87 (6th Cir.1997)). By failing to refer to any support for the conclusion that removing the potential for a large attorney fee award has a far-reach-

ing influence on prisoners who are considering filing frivolous claims, the decisions in *Madrid* and *Boivin* fail to provide a satisfactory reason for upholding the statute under the rational basis test. "[E]ven in the ordinary equal protection case calling for the most deferential standards, we insist on knowing the relation between the classification adopted and the object to be attained." *Romer,* 517 U.S. at 632, 116 S.Ct. 1620.

Defendant contends that the attorney fees cap provides a needed economic disincentive to filing suit because prisoners lack certain disincentives that exist for other civil rights plaintiffs, including balancing the time constraints of working and taking care of family responsibilities. *See Kerr v. Puckett,* 138 F.3d 321, 323 (7th Cir.1998) ("Congress deemed prisoners to be pestiferous litigants because they have so much free time on their hands and there are few costs to filing suit. Opportunity costs of litigation rise following release, diminishing the need for special precautions against weak suits."); *Morrison v. Davis,* 88 F.Supp.2d 799, 806 n. 9 (S.D.Ohio 2000) ("Rather than disadvantage prisoners relative to other litigants, Congress expressed the need to diminish the unfair advantage prisoners had over other litigants (in resources and time to litigate), as well as end perceived abuses of the justice system."). Regardless whether prisoners need additional disincentives to file frivolous lawsuits, this argument falls short because the cap on attorney fees does not constitute a disincentive to them.

b. Disincentives to lawyers

Defendant argues that the attorney fee cap insures that lawyers will not represent prisoners without satisfying themselves of the merits of the case given the limited chance for compensation, thereby reducing frivolous prisoner litigation. In making this argument, defendant fails to address the fact that lawyers have no incentive to agree to represent prisoners in frivolous

cases whether or not there is an attorney fee cap. First, Fed.R.Civ.P. 11 prohibits attorneys from filing frivolous lawsuits. Second, attorneys assume the risk that they will recover fees under § 1988 only if they prevail on the merits when they agree to represent indigent prisoners in civil rights cases. As a result, a lawyer has no incentive to represent a prisoner without the assurance that his claim is viable. Therefore, the attorney fee cap is not rationally related to reducing non-existent incentives.

In nearly 100% of all prisoner cases, whether a prisoner will have legal representation is not the prisoner's decision but the court's. Contrary to what Congress seems to have believed when it enacted this legislation, there are no clouds of lawyers hovering at the prison gates, hoping to instigate civil rights cases that will bring them a windfall fee. The reality is utterly different. The vast majority of prisoner cases are filed and prosecuted without counsel, which is a major reason why they are so difficult for courts to manage and resolve. Indeed, in thirty years of handling prisoner civil rights cases, I can think of none that was initiated by a bona fide lawyer. Only a tiny percentage of the filed cases have the benefit of appointed counsel. For example, of the 1,980 prisoner civil rights cases filed in both the federal courts in Wisconsin between January 1995 and September 1999, only 49, or 2.5%, had counsel appointed. *See* 1995–1999 Annual Reports of the Director of the Administrative Office, *Judicial Business of the United States Courts;* WisTAF Grantee Quarterly Reports, 4th Quarter 1994 to 3rd Quarter 1999.

Finding public spirited lawyers who will accept appointments in cases that have been screened and found by the court to require counsel for their resolution is a challenging task for district courts. *See Mallard v. United States District Court for Southern District of Iowa,* 490 U.S. 296, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989) (holding that 28 U.S.C. § 1915 does not authorize federal court to require unwilling lawyer to represent indigent litigant in civil case and explaining elaborate plan that Iowa district courts had developed with assistance of state bar and Legal Services Corporation to recruit counsel for representation of indigent persons). Lawyers who accept appointments do so knowing that they have no guarantee of receiving compensation for their time or reimbursement for their out-of-pocket costs such as court reporters for depositions, expert witnesses, travel, computer-assisted legal research, witness fees or even photocopies. (Some courts, such as those in Iowa, have funds they use for reimbursement of out-of-pocket costs, presumably raised from the bar or other non-public sources, since there is no governmental source for such funding.) It is ironic that in its effort to deter the filing of frivolous suits and thus reduce the burden on the courts, Congress made it more difficult for courts to persuade lawyers to accept appointment. As a result, courts must spend more time resolving prisoner cases without the assistance that lawyers can provide the court as well as the litigant.

In an attempt to support its decision to uphold § 1997e(d), the First Circuit wrote that, "to the extent that Congress thought that lawyers were exhorting prisoners to pursue frivolous claims in the hope that lightning would strike—that, say, a runaway jury would hand down a favorable verdict or a sympathetic judge would couple a smidgen of relief with a large fee award—the fee cap would then curtail that behavior, thereby reducing the overall number of frivolous suits in the system." *Boivin,* 225 F.3d at 44. Such thinking on Congress's part is not based on fact. Truly frivolous claims cannot make it past the initial screening. Furthermore, lawyers have no incentive to take frivolous cases, for all the reasons stated previously. "[E]qual protection [review] is not a license for courts to judge the wisdom, fairness, or logic of legislative

choices," but rational basis is not intended to be a rubber stamp for legislation that has no relationship to reality. *FCC,* 508 U.S. at 313, 113 S.Ct. 2096.

In *Lindsey v. Normet,* 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), the Supreme Court examined the fit between the government's interest in screening out frivolous appeals and a state statute that required tenants challenging eviction proceedings to post a bond equal to twice the amount of rent expected to accrue during appellate review and to forfeit the entire double-bond if their appeals were unsuccessful. No other civil litigants were subjected to such a double-bond requirement. Holding that the double-bond requirement violated the equal protection clause of the Fourteenth Amendment under rational basis review, the Court stated that the requirement did not effectuate the state interests of having adequate security to preserve the property, protecting damage awards or insuring a landlord the actual rent accrued. *Id.* at 77, 92 S.Ct. 862. The Court concluded that the statute "imposes additional requirements that ... bear no reasonable relationship to any valid state objective and that arbitrarily discriminate against tenants appealing from adverse decisions in [eviction] actions." *Id.* at 76–77, 92 S.Ct. 862. Rejecting the government's contention that the classification was rationally related to the goal of screening out frivolous appeals, the court reasoned, "[t]he claim that the double-bond requirement operates to screen out frivolous appeals is unpersuasive, for it not only bars nonfrivolous appeals by those who are unable to post the bond but also allows meritless appeals by others who can afford the bond." *Id.* at 78, 92 S.Ct. 862.

In similar fashion, the cap on attorney fees in § 1997e(d) fails to satisfy rational basis scrutiny. In *Walker v. Bain,* 65 F.Supp.2d 591, 603 (E.D.Mich.1999), the court explained that "the connection is even more tenuous here than in *Lindsey* because, unlike the statute in *Lindsey*

which brought at least some frivolous appeals within its sweep, by its terms attorney fees under § 1988 are available only to successful plaintiffs, and therefore § 1997e[ ] targets only successful claims." Following the Supreme Court's rationale in *Lindsey,* I conclude that the relationship between the government's goal in reducing frivolous prisoner litigation and the cap on attorney fees is too weak to pass constitutional muster even under the rational basis test. In *Boivin,* 225 F.3d at 44, the First Circuit tried to distinguish *Lindsey,* stating, "The fee cap fits much more snugly with the goal of reducing the volume of frivolous suits because it has the principal effect of encouraging both prisoners and lawyers who are mulling whether to bring covered cases to ask if the game is worth the candle, given the relief available." As I have noted, I find this explanation unconvincing. It is a little like arguing that a rational response to the problem of a dusty toaster is to put a cover over the coffee pot. The presumed "fit" between problem and solution is illusory. The cap bears no relationship to the goal of deterring frivolous lawsuits.

Defendant points to the Supreme Court's decision in *Bankers Life & Casualty Company v. Crenshaw,* 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988), to counter plaintiff's reliance on *Lindsey.* In *Bankers Life,* the Supreme Court rejected an equal protection challenge to a Mississippi statute that required appellants from money judgments (as well as some other judgments) to pay an additional assessment of 15 percent of the judgment upon losing their appeals. The Court distinguished *Lindsey,* stating that the means chosen "are reasonably related to the achievement of the State's objectives of discouraging frivolous appeals, compensating appellees for the intangible costs of litigation, and conserving judicial resources." *Id.* at 85, 92 S.Ct. 862. Although the Court recognized "a state statute need not be so perfectly calibrated in order to pass muster under the rational-

basis test," the Court's opinion does not justify the enactment of a statute, such as § 1997e(d), that purports to achieve a goal by treating prisoners differently from other civil rights plaintiffs but fails to achieve that goal. *Id.*

I conclude that any relationship between an award of attorney fees to successful prisoners and the initial filing of frivolous civil rights suits is "so attenuated as to render the distinction arbitrary or irrational," *City of Cleburne*, 473 U.S. at 446, 105 S.Ct. 3249, and that the "only conceivable purpose served by the cap on attorney fees is to limit the number of attorneys willing to represent prisoners because of reduced financial incentives." *McLindon*, 2000 WL 1221854, at *8 (§ 1997e(d)(2)-(3)); *see also Wolff v. Moore*, 104 F.Supp.2d 892, 898 (S.D.Ohio 2000) (§ 1997e(d)(3)); *Walker*, 65 F.Supp.2d at 603 (§ 1997e(d)(2)). Because this interest can only be motivated by ignorance or a " 'bare ... desire to harm a politically unpopular group,' " it is "not [a] legitimate state interest[ ]." *City of Cleburne*, 473 U.S. at 447, 105 S.Ct. 3249 (quoting *United States Dep't of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)). "The sheer breadth [of the fee cap] is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests." *Romer*, 517 U.S. at 632, 116 S.Ct. 1620. To be sure, Congress's goal of reducing the number of prisoners who file frivolous lawsuits is a laudable goal. However, the attorney fees cap does not play any role in achieving this goal.

### 2. *Reducing suits predicated on trivial harms*

█ Defendant contends that the cap on attorney fees furthers the government's interest in reducing lawsuits predicated on trivial harms. Relying on this justification to uphold § 1997e(d)(3), the Sixth Circuit observed in *Hadix*, 2000 WL 1468419, at *3, that prior to the fee cap, "an attorney would have little disincentive to take prisoner civil rights claims that alleged a technical, but very trivial violation." The court thought that lawyers would be apt to adopt a " 'shotgun' " approach, filing numerous claims in the hope that at least one minor violation might stick. *Id.* Dissenting, Judge Jones noted the improbability of such an event. *Id.* at *5–6: "As a predicate to eligibility for fees under § 1988, a plaintiff must not only prevail in a § 1983 action, but must receive substantial relief on the merits of her claim." Judge Jones added that *Farrar v. Hobby*, 506 U.S. 103, 115, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), provides that fees are not to be awarded where only nominal damages are obtained. "Given that § 1988 does not permit a fee award for frivolous or trivial suits, the fees limitation of [§ 1997e] cannot be rationally related to either of these purposes." *Id.* at *6.

There is little force to the argument that the attorney fees cap will reduce the number of suits filed by prisoners for relief for trivial harms by providing lawyers with an extra disincentive to agree to pursue such claims. Prisoner litigation is a burden to the courts because of the significant number of frivolous or trivial suits filed by prisoners, not because of prisoner suits filed by lawyers. In any event, lawyers are barred from recovering for representing prisoners in trivial civil rights cases, as Judge Jones pointed out in his dissent in *Hadix*. The government's interest in reducing trivial suits does not justify § 1997e(d)'s limit on attorney fees in successful civil rights cases.

### 3. *Protecting the public fisc*

█ Defendant contends that the PLRA's limit on attorney fees furthers the government's interest in conserving public resources. Although protection of the public fisc is a legitimate goal, this objective cannot be achieved "by arbitrarily singling out a particular class of persons to

bear the entire burden of achieving that end." *Walker*, 65 F.Supp.2d at 604.

In *Rinaldi v. Yeager*, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966), the Supreme Court struck down on equal protection grounds a state law that required prisoners who appealed unsuccessfully from their convictions to reimburse the county for the cost of the trial transcript, but did not impose the same requirement on persons who appealed unsuccessfully from a suspended sentence, fine or probation. The Court found no rational basis for distinguishing between unsuccessful appellants who were prisoners and those who were not. *Id.* at 308, 86 S.Ct. 1497. Concluding that the only difference between the two classes of unsuccessful appellants was the nature of the penalty attached to the offenses they had committed, the Court stated, "To fasten a financial burden only upon those unsuccessful appellants who are confined in state institutions, however, is to make an invidious discrimination ... [because] there is no defensible interest served by focusing on that distinction as a classifying feature in a reimbursement statute, since it bears no relationship whatever to the purpose of the repayment provision." *Id.* at 309, 86 S.Ct. 1497.

The only difference between successful civil rights litigants who are subject to the attorney fee cap and those who are not is that the former are incarcerated. "The only manner in which the distinction between prisoners and nonprisoners relates to the goal of protecting the public fisc is by making prisoners (or *pro bono* attorneys) bear the entire extent of that burden for no other reason than the fact that they are prisoners (or attorneys who have undertaken to represent prisoners). Such an arbitrary discrimination ... is not a permissible means of guarding the state's purse." *Walker*, 65 F.Supp.2d at 604–605. Congress chose to award attorney fees to successful civil rights litigants by enacting § 1988. *See Hernandez v. Kalinowski*, 146 F.3d 196, 199 (3d Cir.1998) (stating

that purpose of § 1988 "is to ensure effective access to the judicial process for persons with civil rights claims, and to encourage litigation to enforce the provisions of the civil rights and constitutional civil rights provisions"). Congress cannot deny fees to some successful civil rights plaintiffs solely on the basis of their status as prisoners. *See Walker*, 65 F.Supp.2d at 605. Because defendant has failed to explain how the "distinctions ... drawn [in § 1997e(d) ] have 'some relevance to the purpose for which the classification is made,'" the goal of protecting the public fisc fails to justify the classification under the rational basis test. *Rinaldi*, 384 U.S. at 309, 86 S.Ct. 1497.

### 4. *Preventing windfall fee awards*

■ Defendant reasons that by capping recoverable fee awards and by limiting the maximum hourly rate, § 1997e(d) reduces judicial discretion which, in turn, reduces the likelihood of disproportionate fee payments. However, the Supreme Court has set forth an intricate framework within which judges determine the reasonableness of fee applications under § 1988. *See People Who Care v. Board of Education School District No. 205*, 90 F.3d 1307, 1310 (7th Cir.1996) ("Clear guidelines have been developed to aid courts in calculating the amount of those fees.") "Initially, the court must determine a 'lodestar' amount by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. The court may then reduce or augment the lodestar amount by considering twelve other factors, commonly known as the *Hensley* factors. The most important of these factors is the 'results obtained.'" *Jaffee v. Redmond*, 142 F.3d 409, 413 (7th Cir.1998). *See Hensley v. Eckerhart*, 461 U.S. 424, 429 n. 3, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (listing the 12 factors).

The Supreme Court has rejected the idea that failure to limit recovery will result in windfalls to lawyers, stating "the very nature of recovery under § 1988 is

designed to prevent any such 'windfall.' ... [because] fee awards, properly calculated, by definition will represent the reasonable worth of services rendered in vindication of a plaintiff's civil rights claim. It is central to the awarding of attorney's fees under § 1988 that the district court judge, in his or her own good judgment, make the assessment of what is a reasonable fee under the circumstances of the case." *Blanchard v. Bergeron*, 489 U.S. 87, 96, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989).

Defendant fails to explain why the risk of windfall fee awards is higher in successful prisoner civil rights cases than in successful non-prisoner civil rights cases. Both involve cases in which civil rights plaintiffs are represented by lawyers who have litigated their clients' cases to successful completion and as a result, are entitled to attorney fees under § 1988. To the extent that defendant's concern is that prisoner cases sometimes result in low damage awards and high attorney fee requests, these considerations are dealt with by judges in their calculations of appropriate fee awards under § 1988 on a case-by-case basis.

Although the limits in § 1997e(d) may be helpful in furthering the government's interest in preventing windfall fee awards, it is wholly unclear why the limits are needed only in prisoner cases. There is no explanation why the additional limits of § 1997e(d) are necessary in light of the many safeguards that prevent judges from awarding civil rights lawyers windfall fees. In the absence of any justification for Congress's decision to single out prisoners for this burden, the government's interest in preventing windfall fee awards does not provide a rational basis for § 1997e(d).

### 5. *Standardizing fee rates*

Defendant contends that § 1997e(d)(3)'s requirement that a lawyer representing a prisoner cannot recover more than 150% of the hourly rate allowed for court appointed counsel in criminal cases encourages uniformity among lawyers' rates in criminal and civil cases. Defendant's argument fails to address one significant difference between the fees paid to lawyers representing indigent criminal defendants and fees paid to lawyers representing indigent prisoner civil rights plaintiffs: criminal defense lawyers are paid regardless of the outcome of the case. Although lawyers in civil rights cases are allowed to recover 50% more than lawyers in criminal cases, this difference does not account for the financial risk involved in representing a prisoner in a civil rights action.

In addition, defendant's contention that § 1997e(d) standardizes rates charged for lawyers who represent indigent criminal defendants and indigent prisoner plaintiffs fails to account for the rates charged by pro bono lawyers in private practice or public interest organizations who represent non-prisoner indigent plaintiffs. Section 1983 authorizes suits only against persons acting under the color of state law. "Except in the relatively rare situation in which private persons are deemed state actors, this means that damages in § 1983 actions and attorney fees awarded under § 1988 will be assessed against public officials and, by extension, the public treasury of the states." *Walker*, 65 F.Supp.2d at 603–04. Because the state is responsible for attorney fees in civil rights cases involving plaintiffs who are prisoners and non-prisoners, the government's interest in standardizing rates charged by lawyers applies to all civil rights cases. Targeting inmates who are successful in civil rights litigation does little to further the goal of standardizing rates overall, *see McLindon*, 2000 WL 1221854, at *9, and suggests that Congress has singled out one group, lawyers willing to accept appointment as counsel for a prisoner, for differential treatment solely because of the status of their clients.

### 6. *Conclusion*

Although defendant points to several legitimate governmental interests in defense

of § 1997e, he has failed to demonstrate that there is a link between the differential treatment between prisoners and nonprisoners and the proffered interests. The inevitable inference is that the law is "born of animosity toward the class of persons affected." *Romer,* 517 U.S. at 634, 116 S.Ct. 1620. Accordingly, I conclude that the PLRA's limits on attorney fees violate the equal protection guarantees of the Fifth Amendment because of the lack of a rational basis between the government's interests and the classification in the statute.

### D. *Injury*

 Defendant contends that plaintiff's equal protection claim should fail because he has not established that he has been injured by any denial of his constitutional right of access to the courts, citing *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Defendant misunderstands the nature of plaintiff's claim. It is that § 1997e(d)'s distinction between successful prisoner civil rights plaintiffs and successful non-prisoner civil rights plaintiffs violates his right to equal protection, not his right of access to the courts. To the extent that defendant is arguing that plaintiff does not have standing to bring this claim because he is not injured, defendant is mistaken. As a prisoner, plaintiff is subject to the provisions of the Prison Litigation Reform Act. Having brought a successful civil rights case in which he was represented by counsel, plaintiff has standing to challenge § 1997e(d).

### E. *Award of Attorney Fees*

In order to recover attorney fees under § 1988, the party seeking fees must qualify as a "prevailing party." The Supreme Court has held that "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar,* 506 U.S. at 111, 113 S.Ct. 566. The parties do not dispute that plaintiff is a prevailing party

under § 1988. Pursuant to 42 U.S.C. § 1988(b), a "prevailing party" may recover "reasonable attorney's fee as part of the costs." Plaintiff requests an award of $101,776.01, including $92,997.20 in attorney fees and $8,778.81 in costs. In the document entitled, "Defendant's Objections to the Plaintiff's Motion for Award of Attorneys' Fees, Costs and Expenses," defendant did not object to the amount of plaintiff's request except insofar as it exceeded the limits of § 1997e(d). Plaintiff's award will be determined without regard to § 1997e(d)(2)'s limit on the award of attorney fees to 150% of the amount of the judgment and § 1997e(d)(3)'s limit on the hourly rate of a prisoner's lawyer to 150% of the hourly rate allowed for court-appointed counsel in criminal cases.

### 1. *Lodestar methodology*

 In general, courts calculate a reasonable fee by "multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate." *Simpson v. Sheahan,* 104 F.3d 998, 1001 (7th Cir.1997) (describing the lodestar methodology).

### a. Reasonable hourly rate

 Plaintiff requests hourly rates ranging from $30 per hour for a member of the library staff to $325 for one of the six lawyers who worked on the case. Specifically, plaintiff requests an hourly rate of: $275 for lawyer David Harth; $160 for lawyer Mark Neuser; $151.50 for lawyer Katherine Stadler; $150 for lawyer Jeffrey Simmons; $140 for lawyer Christopher Hanewicz; $105 for law clerk Jennifer Peterson; $95 for paralegal Kasey Schuttler; $85 for library staff Pamela Noyd; and $30 for library staff Melissa Mooney. In support of his request, plaintiff submits affidavits from three lawyers who practice in Madison, Wisconsin, all of whom aver that the hourly rates charged by litigation partners in the relevant geographical area range from $185 to $275 and that the

hourly rates charged by litigation associates in the area range from $135 to $175. Plaintiff contends that his lawyers' hourly rates are justified by their high level of skills, considerable experience and superior reputation.

In determining the proper hourly rate, the court must try to determine the "prevailing market rates in the relevant community" for the service rendered. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The reasonable hourly rate for lodestar purposes is " 'the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question.' " *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 555 (7th Cir.1999) (internal citations omitted). I find that plaintiff's requested hourly rates are reasonable with one exception. The request for reimbursement for .9 hours for library staff will be denied in the absence of any indication that fees for staff other than lawyers, law clerks and paralegals are recoverable under § 1988.

b. Reasonable hours expended

Section 1997e(d)(1)(A) requires that the fee be "directly and reasonably incurred in proving an actual violation of the plaintiff's rights.... " Plaintiff seeks compensation for 490.9 out-of-court hours and 34.2 in-court hours, totaling 525.1 hours. In support of his request, plaintiff submitted a table listing the date, name of the lawyer performing the work, number of hours and a short description of the work performed. Plaintiff contends that the number of hours his lawyers spent on the case is justified by the difficulty of proving deliberate indifference under the Eighth Amendment and the challenges of communicating with an incarcerated client. In addition, plaintiff points out that his lawyers spent additional time as a result of certain actions of opposing counsel, includ-

ing counsel's refusal to accept service of subpoenas, to waive witness fees for prison doctors, to make prison doctors available for deposition anywhere other than the correctional institutions where they work and his requirement that plaintiff's lawyers request records from each institution individually.

The table demonstrates that plaintiff's lawyers' time was spent in proving and seeking redress for a violation of plaintiff's Eighth Amendment rights. I find that plaintiff's request for compensation for 525.1 hours is reasonable in light of the extensive discovery conducted by plaintiff's lawyers, the special challenges of working with an incarcerated client, the medical and constitutional complexities of the case, the opposition to defendant's motion for summary judgment, the extensive trial preparation required in a case such as this and the forgone opportunities to perform work for paying clients.

2. *Discretion of the court*

Section 1997e(d)(1)(B) requires that the amount of the fee be "proportionately related to the court ordered relief for the violation." In addition, the court may consider the following twelve factors in determining a fee award: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Hensley*, 461 U.S. at 430 n. 3, 103 S.Ct. 1933.

Plaintiff vindicated his constitutional rights under the Eighth Amendment, receiving $10,000 in compensatory damages

and $30,000 in punitive damages. In addition to compensating plaintiff for the suffering defendant Daley caused, the jury also sent a significant message by imposing damages to punish defendant Daley for failing to provide plaintiff with the medical treatment he is guaranteed by the Constitution. The vindication of a constitutional right and the deterrent effect of the punitive damages award are central to achieving justice in the court system and preventing future abuses of the constitutional rights of prisoners. Awarding attorney fees to plaintiff is essential not only to compensate his lawyers, but also to encourage other lawyers to represent prisoners in civil rights cases that involve serious and complex constitutional issues.

In light of the gravity of the constitutional violation and the importance of encouraging lawyers to represent prisoners in such cases in the future, I find that a fee award of $80,000, or 200% of the judgment, is not disproportionate to the jury's award of $40,000 in damages. *See Dunning v. Simmons Airlines, Inc.,* 62 F.3d 863, 873 n. 13 (7th Cir.1995) (noting the importance of compensating lawyers " 'to ensure vigorous enforcement of civil rights' "); *Charles v. Daley,* 846 F.2d 1057, 1063 (7th Cir. 1988) (noting that § 1988 seeks to "reimburse with reasonable attorneys' fee those who as 'private attorneys general' take it upon themselves to invoke and thereby invigorate federal constitutional and statutory rights"). I also find that plaintiff's request for an award of costs in the amount of $8,778.81 is reasonable.

3. *Portion of monetary judgment to satisfy amount of attorney fees*

■ Section 1997e(d)(2) provides that "[w]henever a monetary judgment is awarded [to a prisoner in a civil rights action], a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant." The parties do not address what percentage of attorney fees should be shifted back to plaintiff and

"[n]either the plain language of the statute, nor the legislative history of the attorney fees provisions of the PLRA provide guidance in determining the appropriate percentage of the damage award to be used to offset an attorney fees award." *Morrison,* 88 F.Supp.2d at 811.

The jury found that defendant Daley's denials of the requests to have plaintiff evaluated for a liver transplant violated plaintiff's Eighth Amendment right to adequate medical treatment and that plaintiff was entitled to significant punitive damages to punish defendant Daley for his unconstitutional actions. "In light of the facts of this case, the constitutional rights implicated and the jury's clear signal that [defendant] should be punished," I find that a $200 assessment against the judgment is appropriate under § 1997e(d)(2). *Id.*

ORDER

IT IS ORDERED that plaintiff Cedric Johnson's requests for $101,776.01 or, in the alternative, $45,230.31 is DENIED. FURTHER, IT IS ORDERED that defendant is to pay plaintiff $88,208.81, minus $200, for a total of $88,008.81.