**Arnold CARBONELL, Plaintiff,**

v.

**C.O. ACRISH, et al., Defendants.**

**No. 99 CIV 3208 AJP.**

United States District Court,
S.D. New York.

April 18, 2001.

### OPINION AND ORDER

PECK, United States Magistrate Judge.

This Opinion addresses an issue of first impression in this Circuit: the constitutionality of provisions of the Prison Litigation Reform Act ("PLRA") that cap attorneys' fee awards to victorious prisoners.

On November 6, 2000, plaintiff Arnold Carbonell, an inmate at Green Haven Cor-

rectional Facility, and defendants, employees of the New York State Department of Correctional Services ("DOCS"), settled this § 1983 medical indifference action for $15,000, leaving the amount of attorneys' fees for Court resolution. Counsel for Carbonell, Samuel Abady, applied for attorneys' fees and costs of $183,113.17; defendants opposed the motion, arguing that because of PLRA fee caps, Abady is entitled to only $21,239.65.[1]

The parties (and the United States as intervenor) have addressed the constitutionality of the PLRA provisions that cap legal fees at 150% of the judgment amount, 42 U.S.C. § 1997e(d)(2), and cap the hourly rate for legal fees at 150% of the hourly rate payable to Criminal Justice Act counsel, 42 U.S.C. § 1997e(d)(3). For the reasons set forth below, the Court upholds the constitutionality of the 150% of judgment amount cap on attorneys' fees, 42 U.S.C. § 1997e(d)(2). The Court need not reach the issue of the constitutionality of the PLRA's hourly rate fee cap, 42 U.S.C. § 1997e(d)(3), since, even at the PLRA hourly rate, counsel's fees exceed the 150% of judgment fee cap. Accordingly, as more fully set forth below, Carbonell's counsel (Samuel Abady) is awarded $22,500.00 in attorneys' fees and $3,001.50 in costs.

### FACTS

Plaintiff Arnold Carbonell, an inmate at Green Haven Correctional Facility, brought this action pro se against various officials and employees of the New York State Department of Correctional Services ("DOCS"). (Dkt. No. 2: Compl.; Dkt. No. 12: Amended Compl.) Carbonell brought the action under 42 U.S.C. § 1983 and the Eighth Amendment, alleging deliberate indifference to his serious medical needs.

*See Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *1 (S.D.N.Y. June 13, 2000) (Peck, M.J.). "Specifically, Carbonell complain[ed] of prison officials' treatment of (1) an ankle injury he suffered on November 2, 1998 (Dkt. No. 12: Amended Compl. ¶¶ 7–11), and defendant Corrections Officer Simon's conduct that allegedly caused Carbonell to fall down a flight of stairs while he was on crutches the following month (*id.* ¶ 12), and (2) his Hepatitis C, first diagnosed on July 7, 1998 (*id.* ¶ 13)." *Carbonell v. Goord,* 2000 WL 760751 at *1. The Amended Complaint sought only monetary damages. (Amended Compl. ¶ 16.)

After the conclusion of discovery, the Court granted defendants' summary judgment motion on all claims except Carbonell's claims that: (1) Nurse Acrish "maliciously denied him alpha interferon" for his Hepatitis C on December 15, 1998, and (2) Correction Officer Simon on December 28, 1998 maliciously forced Carbonell to use the stairs while Carbonell was on crutches, causing Carbonell to fall down the stairs. *Carbonell v. Goord,* 2000 WL 760751 at *8–11. (*See also* Dkt. No. 46: 11/24/00 Affidavit of Samuel Abady ¶ 4; Dkt. No. 54: State Br. at 2–3.)

The Court required the pretrial order to be submitted by July 13, 2000 and set trial for August 15, 2000. (Dkt. No. 31: 6/27/00 Order.) Defendants timely submitted their portion of the pretrial order. (*See* Dkt. Nos. 32–33: 7/17/00 State PTO Submission & 7/19/00 Memo Endorsed Order.)

At the final pretrial conference on August 1, 2000, Samuel Abady made his first appearance as counsel for Carbonell. (8/1/00 Conf. Tr. at 2–5; *see* State Br. at 1; Abady 11/24/00 Aff. ¶ 5 ("On August 1, 2000, the undersigned first appeared for plaintiff by way of telephone conference

---

1. The parties have consented to disposition of all aspects of this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 18.)

with the Court.").) At Abady's request, in order to allow for his August vacation and for him to prepare for trial, the Court rescheduled trial for September 18, 2000. (8/1/00 Conf. Tr. at 4–5, 10; *see* State Br. at 2.)

Trial began on September 18, 2000 before a jury. (Dkt. No. 44: Trial Transcript ["Tr."]; *see* Abady 11/24/00 Aff. ¶ 6; State Br. at 4.) After two and a half days of testimony and a day and a half of deliberations, the jury reported that it was hopelessly deadlocked. (Tr. 631; *see* State Br. at 4.) The Court declared a mistrial and scheduled a new trial for November 28, 2000. (Tr. 634; *see* Abady 11/24/00 Aff. ¶¶ 6–7; State Br. at 4.)

On October 6, 2000, Abady filed a separate, new lawsuit on behalf of Carbonell against various DOCS officials complaining about many other aspects of Carbonell's prison medical care (hereafter, the "New Action"). (00 Civ. 7564, *Carbonell v. Goord*, Dkt. No. 1: Compl.) Included in the New Action was a claim that DOCS failed to immunize Carbonell against Hepatitis B in violation of the medical standard of care which "required that persons with Hepatitis C be immunized against Hepatitis B." (*Id.* ¶¶ 63–68.)

The parties engaged in "extensive" Court-supervised settlement discussions in this case in late September and into October 2000. (*See* Abady 11/24/00 Aff. ¶ 8; State Br. at 5.) Those discussions resulted in the November 6, 2000 "Stipulation of Settlement and Order of Dismissal" (hereafter, "Settlement Agreement"). (Dkt. No. 43.) The Settlement Agreement provided that DOCS would (1) pay Carbonell $15,000, and (2) immunize him against Hepatitis B, in return for which Carbonell would, *inter alia,* "amend the complaint in the New Action withdrawing with prejudice the claim related to Hepatitis B." (Settlement Agmt. ¶¶ 3–4, 7.)[2]

The Settlement Agreement further provided that DOCS would pay Carbonell's reasonable statutory attorneys' fees and costs, either in an amount agreed upon by the parties or as determined on motion by the Court. (Settlement Agmt. ¶¶ 2, 5.) The Settlement Agreement also provided that "[n]o part of the payment of attorneys fees shall be deducted from the [$15,000] payment to plaintiff [Carbonell]." (Settlement Agmt. ¶ 6.)

The parties were unable to agree on the amount of attorneys' fees. (*See* Abady 11/24/00 Aff. ¶ 9.) On December 6, 2000, Abady[3] moved for "a declaration that the cap on attorneys fees in the Prison Litigation Reform Act ('PLRA'), 42 U.S.C. § 1997e(d)(3) for prisoners who prevail in civil rights actions violates equal protection under the Due Process clause of the Fifth Amendment to the United States Constitution" (Dkt. No. 46: Notice of Motion), and sought fees of $166,833.75 and costs of $16,279.42, for a total of $183,113.17. (Dkt. No. 46: Abady 11/24/00 Aff. ¶ 58 & Ex. A.) Specifically, Abady argued that § 1997e(d)(3), which caps the hourly rate for legal fees at 150% of the hourly rate payable to counsel under the Criminal Justice Act ("CJA"), violates equal protection because it "irrationally discriminates between successful civil rights plaintiffs who are prisoners from those who are not, in

---

2. Abady described this aspect of the settlement agreement thus: "defendants and DOCS agreed to ... immunize plaintiff against Hepatitis B in exchange for withdrawal of that cause of action in the New Action." (Abady 11/24/00 Aff. ¶ 8; *see also* State Br. at 5 (using almost identical language).)

3. Because it is clear that any recovery of attorneys' fees will go directly to Abady as counsel for plaintiff Carbonell, the Court will refer to the fee application and arguments as Abady's.

that non-prisoners can recover attorneys fees at market rates under [42 U.S.C.] § 1988, whereas prisoners can recover only reduced fees under § 1997e(d)(3)." (Dkt. No. 49: Carbonell Br. at 1; *see generally id. passim.*) Abady argued in a passing reference in a footnote that § 1997e(d)(2), which limits fees to 150% of the judgment amount, "applies to cases where monetary damages alone are recovered, and therefore is not relevant to the instant case in which Mr. Carbonell obtained monetary and non-monetary relief." (*Id.* at 2 n. 2; *see also id.* at 13 n. 9.) Abady's brief did not challenge the constitutionality of the 150% of judgment fee cap.

The State opposed the amounts sought by Abady, arguing that the PLRA limits attorneys' fees to 150% of the judgment amount. (Dkt. No. 54: State Br. at 9–13.) The State pointed out that Abady had not challenged the constitutionality of the 150% of judgment fee cap, § 1997e(d)(2). (State Br. at 8 n. 9, 11 n. 10.) The State also argued that even if an exception to the 150% of judgment fee cap exists where a settlement includes injunctive relief, Carbonell "never sought the injunctive relief in his complaint or at trial from defendants herein" and further argued that the settlement provided for a Hepatitis B shot but not injunctive relief. (State Br. at 9 n. 9, 11–12.) The State also argued that the hourly rate fee cap in § 1997e(d)(3) was constitutional under "rational basis review" because it advances legitimate purposes of the PLRA. (State Br. at 15; *see also id.* at 14–38.) Finally, based on claims that Abady's billing records were inadequate, his hours were excessive, and his billing rate for certain clerical and other time should be less than the statutory maximum rate, the State argued that attorneys' fees at PLRA hourly rates should be $20,507.65

plus costs of $732, for a total of $21,239.65. (State Br. at 36–51.)

On December 21, 2000, pursuant to 28 U.S.C. § 2403(a), this Court advised the Attorney General of the United States that "plaintiff's counsel has challenged the constitutionality of the Prison Litigation Reform Act's cap on attorney fees in prisoner litigation" and invited the United States "to intervene and present its views on that issue." (Dkt. No. 50: 12/21/00 Order.) On February 20, 2001, the United States submitted an "amicus" brief in which it urged this Court to uphold the constitutionality of § 1997e(d)(3), the PLRA hourly rate fee cap. (Dkt. No. 57: 2/16/01 U.S. Br.) On March 5, 2001, the United States re-filed its brief, characterizing itself as an intervenor in this action instead of an amicus. (Dkt. No. 60: 3/5/01 U.S. Amended Br.)[4]

On March 19, 2001, Abady submitted a reply affidavit. (Dkt. No. 63: Abady 3/19/01 Reply Aff.) With respect to the constitutionality of § 1997e(d)(2), Abady argued that "the equal protection analysis applies equally to the fee cap under subsection (d)(2) and the fee cap under subsection (d)(3). It is limiting the fees of successful civil rights plaintiff's [sic] who happen to be prisoners that violates equal protection; not the mechanism of capping fees, *i.e.*, whether a percentage of some damages award or the hourly rate recoverable." (Abady 3/19/01 Reply Aff. ¶ 5.) Abady further asserted that "obtaining immunization against Hepatitis B represents an item of great value far beyond monetary damages, as it is likely to substantially extend plaintiff's life. However, this litigation did more than simply provide Mr. Carbonell with immunization against Hepatitis B. Rather, it created a sea change in his medical care at Green Haven." (*Id.* ¶¶ 10–11.) According to Aba-

4. The Court grants the United States intervenor status.

dy, "[a]fter settlement of this action, Mr. Carbonell's every medical need is now regarded [by DOCS] as a matter of urgent priority and he reports receiving attentive, comprehensive medical care," which Abady described in further detail. (*Id.* ¶¶ 13–16.) Abady argued that "[t]he above undermines defendants' argument that the outcome of this case was solely about a $15,000 settlement, and therefore, the fee request is disproportional to the outcome. To the contrary, the monetary award was the least significant outcome of the case, and the fee award is certainly proportional to change in Mr. Carbonell's medical care, which is priceless." (*Id.* ¶ 17.)[5]

### ANALYSIS

### I. *THE PLRA PROVISIONS CAPPING ATTORNEYS' FEES*

■ Congress enacted the Prison Litigation Reform Act ("PLRA") on April 26, 1996. "The PLRA, as its name suggests, contains numerous provisions governing the course of prison litigation in the federal courts." *Martin v. Hadix,* 527 U.S. 343, 349–50, 119 S.Ct. 1998, 2002, 144 L.Ed.2d 347 (1999). As the Second Circuit has stated, "Congress adopted the Prison Litigation Reform Act with the principal purpose of deterring frivolous prisoner lawsuits and appeals." *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997), *cert. denied* 523 U.S. 1126, 118 S.Ct. 1812, 140 L.Ed.2d 950 (1998). In upholding the constitutionality of the PLRA requirement that prisoners must pay the full filing fee, 28 U.S.C. § 1915(b), the Second Circuit held:

> The Act easily passes the rational basis test. The problem of frivolous prisoner lawsuits has been well-documented and need not be repeated here.

Suffice it to say that federal courts spend an inordinate amount of time on prisoner lawsuits, only a very small percentage of which have any merit. Although Nicholas contends that the charges of excessive prisoner litigation are exaggerated, Congress's conclusion to the contrary is amply supportable and clearly reasonable. *We therefore have little trouble holding that the Act's goal of relieving the pressure of excessive prisoner filings on our overburdened federal courts is a constitutionally legitimate one.*

Moreover, the means Congress chose to achieve this objective are plainly rational. Prior to the enactment of the *in forma pauperis* amendments, inmates suffered no economic disincentive to filing lawsuits. Indeed, the very nature of incarceration—prisoners have substantial free time on their hands, their basic living expenses are paid by the state and they are provided free of charge the essential resources needed to file actions and appeals, such as paper, pens, envelopes and legal materials—has fostered a "'nothing to lose and everything to gain'" environment which allows inmates indiscriminately to file suit at taxpayers' expense. "As a result, the federal courts have observed that prisoner litigation has assumed something of the nature of a 'recreational activity.'" By making prisoners at least partially responsible for the costs of their suits, the Act undoubtedly will discourage frivolous filings. As one oft-quoted Senator remarked:

> Section 2 will require prisoners to pay a very small share of the large burden they place on the Federal judi-

---

5. By letter dated March 28, 2001, the State asserts that the "assertions in paragraphs 8 through 18 [of Abady's Reply Affidavit], while irrelevant to the issues tried against defen- dants Acrish and Simon, should not be accepted as the facts." (Dkt. No. 64: 3/28/01 State Letter to Court.)

cial system by paying a small filing fee upon commencement of lawsuits. In doing so, the provision will deter frivolous inmate lawsuits. The monetary outlay will force prisoners to think twice about the case and not just file reflexively. *Prisoners will have to make the same decision that law-abiding Americans must make: Is the lawsuit worth the price?*

*Nicholas v. Tucker*, 114 F.3d at 20–21 (emphasis added, citations omitted).

As the Supreme Court has recognized, the attorneys' "fee landscape changed with the passage of the PLRA on April 26, 1996." *Martin v. Hadix*, 527 U.S. at 349, 119 S.Ct. at 2002; *see also, e.g., Blissett v. Casey*, 147 F.3d 218, 220 (2d Cir.1998) ("The attorneys' fees provisions of the PLRA, contained in 42 U.S.C. § 1997e(d), impose substantial restrictions on awards of fees under 42 U.S.C. § 1988 in favor of plaintiffs in prisoner civil rights litigation."), *cert. denied*, 527 U.S. 1034, 119 S.Ct. 2392, 144 L.Ed.2d 793 (1999).

The PLRA's attorneys' fees provisions are codified at 42 U.S.C. § 1997e(d), as follows:

(d) *Attorney's fees*

(1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title,[6] such fees shall not be awarded, except to the extend that—

(A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and

(B) (i) the amount of the fee is proportionately related to the court ordered relief for the violation; or

(ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

(2) Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. *If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.* (3) *No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18,[7] for payment of court-appointed counsel.*

---

**6.** 42 U.S.C. § 1988(b) provides: "In any action or proceeding to enforce a provision of section[] ... 1983 of this title ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...."

**7.** 18 U.S.C. § 3006A, a part of the Criminal Justice Act of 1964 ("CJA"), directs each district to set up a system for "furnishing representation of any person financially unable to obtain adequate representation," in connection with criminal charges. It also provides that attorneys be compensated at a rate authorized by the Judicial Conference, which rate may not exceed $75 per hour. *Id.* § 3006A(d). In the Southern District of New York, "the compensation of Criminal Justice Act attorneys [is] $75 per hour," and thus Section 1997e(d)(3) limits the hourly rate to $112.50 per hour. *Reynolds v. Goord*, 98 Civ. 6722, 2001 WL 118564 at *2 n. 1 (S.D.N.Y. Feb. 13, 2001); *see also Chatin v. Coombe*, 186 F.3d 82, 90 (2d Cir.1999).

Abady argues in the alternative that if the Court were to find the PLRA hourly rate fee cap to be constitutional, the Court should look not to the $75 per hour CJA rate, but the $125 per hour rate for CJA counsel in capital cases, to yield a fee cap of $187.50. (Dkt. No. 46: Abady 11/24/00 Aff. ¶ 19 & n. 14.) Abady's argument appears questionable, *see Madrid v. Gomez*, 190 F.3d 990, 993 n. 2 (9th Cir.1999),

(4) Nothing in this subsection shall prohibit a prisoner from entering into an agreement to pay an attorney's fee in an amount greater than the amount authorized under this subsection, if the fee is paid by the individual rather than by the defendant pursuant to section 1988 of this title.

42 U.S.C. § 1997e(d)(1)-(4) (emphasis added).

The Second Circuit has interpreted "attorneys' fees" to include, in addition to the so-called "lodestar" figure (hours times reasonable hourly rate), "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir.1998).[8]

## II. *ABADY IS ENTITLED TO ATTORNEYS' FEES OF $22,500, 150% OF CARBONELL'S SETTLEMENT AMOUNT*

### A. *Section 1997e(d)(2) is Constitutional Because it is Rationally Related to a Legitimate Governmental Objective*

■ In an action subject to the PLRA, § 1997e(d)(2) imposes a cap on the defendant's liability for section 1988 attorneys' fees of 150% of the amount of the judgment. 42 U.S.C. § 1997e(d)(2); *see, e.g., Boivin v. Black*, 225 F.3d 36, 38 (1st Cir. 2000) ("When a prisoner-plaintiff garners a monetary judgment, section 1997e(d)(2) imposes a ceiling on the defendants' liability for attorneys' fees equal to 150% of the amount of that judgment."); *Collins v. Montgomery County Bd. of Prison Inspectors*, 176 F.3d 679, 683, 685–86 (3d Cir. 1999), *cert. denied*, 528 U.S. 1115, 120 S.Ct. 932, 145 L.Ed.2d 811 (2000); *Blissett v. Casey*, 147 F.3d 218, 220 (2d Cir.1998) ("while the pre-existing § 1988 provided for an award against the losing party of a reasonable attorneys' fee of the prevailing party, the [PLRA] ... appears (in unclear language) to provide that [the attorneys' fee] is not to be borne by the defendant to the extent it exceeds 150 percent of the judgment"), *cert. denied*, 527 U.S. 1034, 119 S.Ct. 2392, 144 L.Ed.2d 793 (1999).[9]

Abady's reply affidavit contends that § 1997e(d)(2) violates equal protection because it irrationally discriminates between successful civil rights plaintiffs who are prisoners and those who are not. (Dkt.

but for the reasons discussed below, the Court need not reach the issue.

8. *See also, e.g., Kuzma v. Internal Revenue Serv.*, 821 F.2d 930, 933–34 (2d Cir.1987) ("Identifiable, out-of-pocket disbursements for items such as photocopying, travel and telephone costs are generally taxable under § 1988 ...." as attorneys' fees.); *Lawson v. City of New York*, 99 Civ. 10393, 2000 WL 1617014 at *5 (S.D.N.Y.2000); *Marisol A. v. Giuliani*, 111 F.Supp.2d 381, 401 (S.D.N.Y. 2000) ("It is well-settled that attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.... Courts have identified the following non-exhaustive list of expenses as those ordinarily charged to clients, and therefore, recoverable: photocopying, travel, telephone costs, and postage.") (internal quotations omitted).

9. *See also, e.g., Morrison v. Davis*, 88 F.Supp.2d 799, 812 (S.D.Ohio 2000) ("This Court believes that the statute is clear, that under § 1997e(d)(2), a defendant's liability for attorney fees is limited to 150% of the judgment."); 2 Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation: Statutory Attorney's Fees* § 1.2 at 4 ("A reasonable interpretation of [section 1997e(d)(2)] is that a § 1988 fee award in excess of 150 percent of the prisoner's damages recovery should be capped at 150 percent of the damages award for purposes of determining the defendants' residual fee liability ....") (3d ed. 1997); John Boston, *Section 1983 Civil Rights Litigation* at 766 (PLI 2000) (§ 1997e(d)(2) "limits defendants' fee liability to 150% of the judgment").

No. 63: Abady 3/19/01 Reply Aff. ¶¶ 2–5.) Abady's initial motion papers did not challenge the constitutionality of § 1997e(d)(2). (*See* page 6 above.) Because he challenged § 1997e(d)(2)'s constitutionality only in reply papers, the Court need not consider the argument. *E.g., Playboy Enter. Inc. v. Dumas,* 960 F.Supp. 710, 720 n. 7 (S.D.N.Y.1997) ("Arguments made for the first time in a reply brief need not be considered by a court.") (citing cases), *aff'd mem.,* 159 F.3d 1347 (2d Cir.1998).[10] Here, this rule would be especially appropriate; the attorneys' actions would not be prejudicing a separate client, since Abady is representing his own interests (not a client's), and his failure to raise this constitutional issue in his opening papers deprived the United States of the opportunity to brief this issue.

Nevertheless, because this constitutional issue is important, and is one of first impression in this Circuit, the Court will proceed to address it on the merits.

■ The parties agree, and the Court holds, that because prisoners are not a suspect class and the PLRA's attorneys' fee restrictions do not violate any fundamental right, the PLRA fee cap provisions are judged under the rational basis review standard. *See, e.g., Heller v. Doe,* 509 U.S. 312, 319–21, 113 S.Ct. 2637, 2642–43, 125 L.Ed.2d 257 (1993); *Abdul–Akbar v. McKelvie,* 239 F.3d 307, 316–19 (3d Cir. 2001) (upholding PLRA's "three strikes" rule under rational basis test), *cert. denied,* —— U.S. ——, 121 S.Ct. 2600, 150 L.Ed.2d 757 (2001); *Benjamin v. Jacobson,* 172 F.3d 144, 164–65 (2d Cir.) (upholding under rational basis test PLRA provision requiring termination of consent decrees not supported by need-narrowness-intrusiveness findings), *cert. denied,* 528 U.S. 824, 120 S.Ct. 72, 145 L.Ed.2d 61 (1999); *Davis v. District of Columbia,* 158 F.3d 1342, 1345–48 (D.C.Cir.1998) (upholding under rational basis test PLRA's requirement that inmates bringing federal action for mental or emotional injury suffered while in custody make prior showing of physical injury); *Nicholas v. Tucker,* 114 F.3d 17, 20–21 (2d Cir.1997) (upholding PLRA filing fee requirement utilizing ra-

---

10. *See also, e.g., Ventre v. Hilton Hotels Corp.,* 98 Civ. 5644, 2000 WL 1011050 at *4 (S.D.N.Y. July 20, 2000) ("It is well-settled that arguments raised in reply papers are not a basis for granting relief."); *People United for Children, Inc. v. City of New York,* 108 F.Supp.2d 275, 301 (S.D.N.Y.2000); *LNC Inv., Inc. v. Republic of Nicaragua,* 96 Civ. 6360, 2000 WL 745550 at *5 n. 4 (S.D.N.Y. June 8, 2000); *Ringenback v. Crabtree Cadillac–Oldsmobile, Inc.,* 99 F.Supp.2d 199, 204 (D.Conn.2000); *Nichols v. American Risk Mgmt., Inc.,* 89 Civ. 2999, 2000 WL 97282 at *2 (S.D.N.Y. Jan. 28, 2000) (Peck, M.J.) ("A court need not consider a new argument raised for the first time in a reply brief."); *United States v. Letscher,* 83 F.Supp.2d 367, 376 (S.D.N.Y.1999); *Amaker v. Goord,* 98 Civ. 3634, 1999 WL 511990 at *13 n. 5 (S.D.N.Y. July 20, 1999); *Richstone v. Chubb Colonial Life Ins.,* 97 Civ. 3481, 1999 WL 287332 at *8 (S.D.N.Y. May 7, 1999); *Abdel–Khalek v. Ernst & Young LLP,* 97 Civ. 4514, 1999 WL 190790 at *6 (S.D.N.Y. April 7, 1999); *Viacom Int'l Inc. v. Kearney,* 98 Civ. 6226, 1999 WL 92601 at *5 n. 2 (S.D.N.Y. Feb. 22, 1999); *Pyramyd Stone Int'l Corp. v. Crosman Corp.,* 95 Civ. 6665, 1997 WL 66778 at *15 n. 2 (S.D.N.Y. Feb. 18, 1997); *Cumis Ins. Soc'y, Inc. v. Citibank, N.A,* 921 F.Supp. 1100, 1110 n. 7 (S.D.N.Y.1996); *Chase Manhattan Bank, N.A. v. T&N plc,* 905 F.Supp. 107, 122 n. 5 (S.D.N.Y.1995); *Sigmon v. Parker Chapin Flattau & Klimpl,* 901 F.Supp. 667, 677 n. 5 (S.D.N.Y.1995); *see also, e.g., Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999) (issue raised for the first time in appellate reply brief need not be considered by appellate court); *Thomas v. Roach,* 165 F.3d 137, 145–46 (2d Cir.1999) (same); *Keefe v. Shalala,* 71 F.3d 1060, 1066 n. 2 (2d Cir. 1995) (same); *Knipe v. Skinner,* 999 F.2d 708, 710 (2d Cir.1993) (same); *NLRB v. Star Color Plate Serv.,* 843 F.2d 1507, 1510 n. 3 (2d Cir.) (same), *cert. denied,* 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 58 (1988).

tional basis test).[11]

[4–9] Under the rational basis test, a statute will be upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe,* 509 U.S. at 320, 113 S.Ct. at 2642; *see also, e.g., Nicholas v. Tucker,* 114 F.3d at 20. The rational basis standard " 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.' " *Heller v. Doe,* 509 U.S. at 319, 113 S.Ct. at 2642 (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993)). The Supreme Court has counseled that the judiciary should not act as a " 'super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.' " *Heller v. Doe,* 509 U.S. at 319, 113 S.Ct. at 2642 (quoting *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976)). A court must uphold the challenged classification " 'if there is any reasonably conceivable state of facts that could provide a rational basis' " for it. *Heller v. Doe,* 509 U.S. at 320, 113 S.Ct. at 2642 (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. at 313, 113 S.Ct. at 2101). The legislature "has no obligation to produce evidence to sustain the rationality of a statutory classification. '[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.' " *Heller v. Doe,* 509 U.S. at 320, 113 S.Ct. at 2643. "Further, a legislature that creates these categories need not 'actually articulate at any time the purpose or rationale supporting its classification. . . .' Instead, a classification 'must be upheld against

equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' " *Heller v. Doe,* 509 U.S. at 320, 113 S.Ct. at 2642. It is not enough for a plaintiff to demonstrate "an imperfect fit between means and ends." *Id.* at 321, 113 S.Ct. at 2643. " '[T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it . . . whether or not the basis has a foundation in the record.' " *Id.* at 320–21, 113 S.Ct. at 2643.

If the question of a rational basis is "at least debatable," then the statute survives the rational basis test. *Heller v. Doe,* 509 U.S. at 326, 113 S.Ct. at 2646. As long as the rational basis test is met, the statute will be upheld "even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer v. Evans,* 517 U.S. 620, 632, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996). On the other hand, a classification will not be upheld if it is motivated by "a bare congressional desire to harm a politically unpopular group." *United States Dep't of Agric. v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782 (1973).

As noted on page 8 above, "Congress adopted the Prison Litigation Reform Act with the principal purpose of deterring frivolous prisoner lawsuits and appeals." *Nicholas v. Tucker,* 114 F.3d at 19. The Second Circuit has held that the PLRA's "goal of relieving the pressure of excessive prisoner filings on our overburdened federal courts is a constitutionally legitimate one." *Id.* at 20 (citing *Hampton v. Hobbs,* 106 F.3d 1281, 1287 (6th Cir. 1997) ("Deterring frivolous prisoner filings

---

**11.** Even those cases that have found PLRA fee cap provisions to be unconstitutional agree that the proper review standard is the rational basis test. (*See* cases cited at page 19 n. 12 below.)

in the federal courts falls within the realm of Congress's legitimate interests....")).

Section 1997e(d)(2)'s 150% of judgment attorneys' fee cap is a rational means to achieve that end. This Court adopts the First Circuit's reasoning upholding the 150% of judgment attorneys' fee cap in *Boivin v. Black*, 225 F.3d 36 (1st Cir.2000), and quotes at length from that opinion:

> In the American civil justice system, the spoils that belong to the victor ordinarily do not include payment of attorneys' fees. Except when a statute or an enforceable contractual provision dictates otherwise, litigants generally pay their own way. *Congress* has the power, however, to revise this schematic, and if it elects to do so, it *may delineate both the circumstances under which attorneys' fees are to be shifted and the extent of the courts' discretion in that respect. Furthermore, this power may be exercised selectively,* that is to say, Congress may "pick and choose among its statutes and ... allow attorneys' fees under some, but not others."

> In perhaps the most striking use of this power to date—the Fees Act, adopted in 1976—Congress gave the courts discretion to award reasonable attorneys' fees to prevailing civil rights litigants. *See* 42 U.S.C. § 1988(b) (Supp. II 1996). Congress later enacted other statutes that hewed roughly to this prototype. In enacting the PLRA, Congress deviated from this pattern, choosing to place some explicit limitations on the fees that courts can award to prisoners' lawyers in civil cases.

> . . . . .

> *Congress enacted the PLRA out of a concern that prisoner litigation, much of it frivolous, was wasting taxpayer money and clogging the courts. See, e.g.,* 142 Cong. Rec. S10576 (daily ed. Sept. 16, 1996) (statement of Sen. Abra-

ham); 141 Cong. Rec. S7526 (daily ed. May 25, 1995) (statement of Sen. Kyl). Congress could well have reasoned that applying the fee cap to nominal damage awards would encourage both prisoners and members of the bar to weigh the likely value of claims before proceeding to court, thus reducing the overall number of prisoner suits and easing the perceived burden of prisoner litigation on the justice system. One can argue with the policy behind such a legislative choice, but one hardly can classify the end result of that policy—measured in the large, and not by the occasional anomalous outcome—as absurd or chimerical.

> . . . . .

> [T]he prison setting is *sui generis,* and Congress's choice to treat prisoners differently than non-prisoners is plainly justified by the idiosyncratic characteristics of that setting. Prisoners' living costs are paid by the public and prisoners have nowhere to go-a combination that gives them more free time than non-prisoners to pursue claims (whether or not valid). The problem of prisoner litigiousness is exacerbated by the nature of prison life, as inmates tend to egg each other on. This problem is further complicated by the constitutionally-protected right to a certain level of, legal assistance. *Experience has shown that these and other factors, acting in concert, encourage inmates to bring large numbers of insubstantial claims— or so Congress rationally could have thought. Thus, we reject Boivin's plaint that the statute distinguishes impermissibly between prisoners and other civil rights plaintiffs.*

> Boivin attempts to elude the inevitability of this result in a variety of ways. Citing the uncontroversial principle that a court ought not to uphold a law moti-

vated by "a bare ... desire to harm a politically unpopular group," he insists that the fee cap discriminates against prisoners with meritorious claims, leaving them bereft of counsel so their claims can more easily be thwarted. But *given the legitimate governmental purposes that underlie the fee cap, see supra, the claim of a bare desire to harm will not fly.* Consequently, the *Moreno* principle has no application on these facts.

As a fallback, *Boivin deplores what he envisions as the complete lack of fit between the means that Congress chose (capping attorneys' fees) and the end that it sought to achieve (reducing frivolous prisoner litigation).* ... [W]e assume that Boivin means that since attorneys' fees are awarded only to *prevailing* parties, the fee cap could have no possible deterrent effect on the filing of meritless actions.

Common sense suggests that this *ex poste* view is untenable. *Congress presumably feared the motivating effect of the prospect of attorneys' fees, ex ante, and the fee cap quells that effect by capping the potential payoff. This changes the odds and forces both lawyer and client, out of self-interest, to assess likely outcomes with greater care before filing a suit that, even if nominally successful, might leave them holding a nearly empty bag.*

To be sure, it can be argued that discouraging lawyers from filing frivolous prisoner suits will fail to reduce the overall number of meritless claims because the suits eschewed by lawyers simply will be prosecuted by prisoners acting pro se. In that event, all that the fee cap will achieve is a reduction in the number of frivolous cases in which pris-oners are represented by counsel. While the argument that we have posited is not illogical, there are still two conceivable ways in which the fee cap might serve to reduce the aggregate number of frivolous prisoner suits. First, Congress may have believed that at least some prisoners would abandon their claims if they could not secure the services of an attorney. Second, *to the extent that Congress thought lawyers were exhorting prisoners to pursue frivolous claims in the hope that lightning would strike-that, say, a runaway jury would hand down a favorable verdict or a sympathetic judge would couple a smidgen of relief with a large fee award—the fee cap would tend to curtail that behavior, thereby reducing the overall number of frivolous suits in the system. Recognizing that rationality review is highly deferential to legislative choices these possibilities are sufficient to sustain the statutory fee cap. . . . .*

.     .     .     .     .

Let us be crystal clear. We do not suggest that there is a seamless fit between section 1997e(d)(2) and the goals that Congress aspired to achieve. However, *rational basis review does not require a perfect accommodation between means and ends. Because a cap on attorneys' fees ... conceivably may discourage prisoners and their counsel from filing frivolous or low-value suits, we think that the fit is close enough to pass constitutional muster.*

*Id.* at 39, 41, 44–46 (emphasis added, citations omitted); *see Morrison v. Davis,* 88 F.Supp.2d 799, 803–13 (S.D.Ohio 2000) (upholding constitutionality of § 1997e(d)(2)).[12]

---

**12.** *See also* cases upholding § 1997e(d)(3) cited at page 25 below; *but see Johnson v. Daley,* 117 F.Supp.2d 889, 894–903 (W.D.Wis.2000) (§ 1997e(d)(2)-(3) violates equal protection);

The Court notes that in the context of Title VII employment discrimination cases, Judge Martin of this Court had suggested adoption of the "billing judgment" approach to statutory attorneys' fees applications:

> The "billing judgment" approach suggested in *Rivera* by Chief Justice Rehnquist ... focuses on the judgment an attorney would exercise in determining the amount of time that should be devoted to a case in light of the anticipated recovery. While that approach would place heavy emphasis on the amount of the potential recovery in cases where the action was brought solely to recover damages sustained by an individual, it is flexible enough to provide reasonable guidance in the "infinitely variable" facts and circumstances alluded to by Justice Powell in *Rivera.*

.  .  .  .  .

A rational billing judgment would attempt to weigh the likely amount of any recovery against the risk of litigation. As Justice Rehnquist noted in *Rivera,* no rational lawyer would devote $25,000 of billable time to a matter where the potential recovery was only $10,000. Indeed, except in exceptional circumstances, no rational lawyer or client would commit to any case an amount for lawyer's fees that approaches the amount of the total recovery.

A client hiring a lawyer does so with the hope that he will get more out of the lawsuit than will the lawyer. Obviously as the probability of success increases, so might the willingness of a client to commit funds for *necessary* attorney's fees. But necessary is a key word.

An honorable lawyer must constantly ask, "Is the amount of my charge for this particular piece of trial preparation justified in light of the contribution it will make to the likelihood of a recovery of a particular amount?" Every lawyer recognizes that it may be reasonable to do certain things to enforce a note for $1,000,000 that would not be appropriate in an attempt to collect a $10,000 note.

The use of a "billing judgment" approach in awarding attorney's fees should have the salutary effect of encouraging lawyers in cases such as this to limit pretrial discovery to that which is reasonable in light of the expected recovery. This Court has seen too many cases in which attorneys engage in excessive discovery in the apparent hope that if liability is established they will be compensated for the total time expended even though the resulting fee award is out of all proportion to the amount of the damages recovered.

*Walker v. Bain,* 65 F.Supp.2d 591, 599–605, 607–10 (E.D.Mich.1999) (§ 1997e(d)(2) violates equal protection); *cf. Collins v. Montgomery County Bd. of Prison Inspectors,* 176 F.3d at 686 ("We have divided equally on the question of whether the limitation of the fees to 150% of the judgment is constitutional and consequently we will affirm the order of the district court to the extent that it upheld that provision."). These district court decisions challenged the Congressional view that lawyers were encouraging prisoners to file cases to generate windfall attorneys' fees, and "conclude[d] that any relationship between an award of attorney fees to successful prisoners and the initial filing of frivolous [prisoner] civil rights suits is 'so attenuated as to render the distinction arbitrary or unwarranted.'" *Johnson v. Daley,* 117 F.Supp.2d at 898, 900; *see also Walker v. Bain,* 65 F.Supp.2d at 609 ("the disincentives of the fee cap provision do not inhibit the filing of frivolous lawsuits by prisoners; they do inhibit the willingness of lawyers to undertake the representation of plaintiffs who file non-frivolous cases."). The Court is sympathetic to these arguments, but the Court is not a "super legislature," and cannot invalidate the PLRA 150% of judgment fee cap under rational basis review, for the reasons discussed by the First Circuit.

*Quaratino v. Tiffany & Co.*, 948 F.Supp. 332, 336–37 (S.D.N.Y.1996) (Martin, J.) (citations omitted), *rev'd*, 166 F.3d 422 (2d Cir.1999). The Second Circuit reversed, finding that the billing judgment "approach conflicts with the legislative intent and rationales of the fee-shifting statute." *Quaratino v. Tiffany & Co.*, 166 F.3d at 426. Unlike Title VII or other civil rights legislation, Congress in the PLRA specifically did enact such a "billing judgment" approach, *see* 42 U.S.C. § 1997e(d)(1)-(2), which is rational for the reasons discussed by the First Circuit in *Boivin* and by Judge Martin in *Quaratino*.

The Court holds that the 150% of judgment amount attorneys' fee cap in § 1997e(d)(2) is constitutional.

**B. Section 1997e(d)(2) Caps Abady's Fees at 150% of Carbonell's $15,000 Monetary Judgment, or $22,500**

■ Abady argues that even if § 1997e(d)(2) passes constitutional muster, "subsection (d)(2) is not pertinent to Mr. Carbonell's case because he obtained significant non-monetary relief in compelling DOCS to provide him with previously withheld treatment for his Hepatitis." (Dkt. No. 49: Carbonell Br. at 13 n. 9; *see also id.* at 2 n. 2.) In support of this position, Abady draws the Court's attention to the following language in the First Circuit's opinion in *Boivin v. Black:*

> We add a caveat. In this case, the plaintiff sought and received only monetary relief. Thus, the fee cap applies. In a case in which the court orders non-monetary redress (say, an injunction)

along with a monetary judgment, the fee cap contained in section 1997e(d)(2) would not restrict the total amount of attorney's fees that the court could award.

(Carbonell Br. at 13 n. 9 (quoting *Boivin v. Black*, 225 F.3d 36, 41 n. 4 (1st Cir.2000) (continuing the fn.: "In such a 'hybrid' case, the court would be free to take into account all the provisions of section 1997e(d).")).)[13]

■ The Court agrees that § 1997e(d)(2)'s 150% of judgment fee cap would not necessarily restrict the total fee amount in cases in which both monetary and injunctive relief are sought in the complaint and obtained. That conclusion, however, is of no help to Abady in the present case. The sole claims in the complaint and amended complaint were for monetary relief (*see, e.g.,* Dkt. No. 12: Amended Compl. ¶ 16), and the only claims submitted to the jury at trial were for monetary relief. (*See* Court Ex. A: Verdict Form; Tr. 575–99.) The request for a Hepatitis B shot for Carbonell arose only during settlement negotiations. The Court assumes that Abady would be entitled to compensation above the 150% of judgment fee cap for work he performed post-trial as part of settlement negotiations to obtain the Hepatitis B shot for Carbonell. However, Abady's billing records for the settlement negotiation period do not distinguish between time spent securing monetary relief and time spent securing the promise of Hepatitis B immunization. (*See* Dkt. No. 46: Abady 11/24/00 Aff. Ex. A: Computerized Billing Records.) Having carefully

---

**13.** *See also Collins v. Montgomery County Bd. of Prison Inspectors*, 176 F.3d 679, 684 n. 5 (3d Cir.1999) ("We point out that there might be some difficult questions raised in a case in which a prisoner obtains extensive and important equitable relief and a modest award of damages. Perhaps in such a case an attor- ney's fee would not be limited by the cap in 42 U.S.C. § 1997e(d)(2). We, however, leave that question to another day as [plaintiff] recovered only monetary damages."), *cert. denied*, 528 U.S. 1115, 120 S.Ct. 932, 145 L.Ed.2d 811 (2000).

reviewed Abady's billing records, the Court sees no principled means of even approximating the time he spent during settlement negotiations on the Hepatitis B immunization issue.

Abady also claims that the 150% of judgment fee cap should not apply because this litigation "created a sea change in [Carbonell's] medical care at Green Haven," and because "after settlement of this action, Mr. Carbonell's every medical need is now regarded [by DOCS] as a matter of urgent priority and [Carbonell] reports receiving attentive, comprehensive medical care." (Dkt. No. 63: Abady 3/19/01 Reply Aff. ¶¶ 11–17.) There are several problems with this. First, factual support for this argument is not in the record before the Court, and is disputed by defendants. (*See* Dkt. No. 64: 3/28/01 State Letter to Court.) Second, when Abady entered his appearance, trial was limited to two issues—Nurse Acrish's alleged denial of alpha interferon on December 15, 1998, and Correction Officer Simon's allegedly forcing Carbonell on December 28, 1998 to use stairs while on crutches. *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *8–11 (S.D.N.Y. June 13, 2000) (Peck, M.J.). The issue of Carbonell's general medical care was not involved in this case; it is, however, the subject of the separate New Action. If Carbonell's medical care improved because of the filing of the New Action, he might seek attorneys' fees in that action (subject to PLRA fee cap provisions) under the "catalyst theory." *See, e.g., Enright v. New York City Dist. Council of Carpenters Welfare Fund,* 99 Civ. 0671, 2001 WL 225032 at *14–15 (S.D.N.Y. Mar. 8, 2001) (Peck, M.J.) ( & cases cited therein). The New Action, however, is neither concluded nor before this Judge.

Any change in the general medical care Carbonell is receiving from DOCS cannot provide a basis to award Abady additional attorneys' fees in this case.

Accordingly, since Carbonell's complaint sought only monetary relief, the action was litigated through trial seeking only monetary relief, Carbonell obtained $15,000 in settlement, and Abady's billing records do not separate out time spent obtaining Hepatitis B immunization in the Settlement Agreement, § 1997e(d)(2) applies,[14] and therefore counsel's fees are capped at $22,500, that is, 150% of the $15,000 judgment amount.

## III. THE COURT NEED NOT REACH THE ISSUE OF THE CONSTITUTIONALITY OF § 1997e(d)(3)'S HOURLY FEE CAP

Every Court of Appeals that has addressed the issue of § 1997e(d)(3)'s hourly rate fee cap has upheld its constitutionality. *See Hadix v. Johnson,* 230 F.3d 840, 840–47 (6th Cir.2000); *Madrid v. Gomez,* 190 F.3d 990, 996 (9th Cir.1999). The Court, however, need not reach that issue here.

It is clear to the Court, after reviewing Abady's billing records, that were it not for § 1997e(d)(2)'s 150% of judgment fee cap, Abady would be entitled to more than $22,500.00 in attorneys' fees, whether at his normal billing rate or at the PLRA's $112.50 hourly fee cap. Indeed, even the State, after taking an aggressive approach to reducing Abady's fee application, concedes that Abady would be entitled to only slightly less than that amount. (*See* State Br. at 36–52.) The Court, therefore, need not reach the question of the constitution-

---

**14.** To be precise, § 1997e(d)(2) does not completely cap plaintiff's attorneys' fees at 150% of the judgment amount, but rather sets that as the cap on defendants' liability for fees. In this case (and presumably most prisoner cases), the distinction is academic because plaintiff's counsel does not seek to recover any fees from his client.

ality of § 1997e(d)(3)'s hourly fee cap,[15] and awards Abady attorneys' fees in the amount of $22,500.00.[16]

## IV. ABADY IS ENTITLED TO $3001.50 IN COSTS

Abady seeks $16,279.42 in costs. (Dkt. No. 46: Abady 11/24/00 Aff. Ex. A at pp. 10–12.)

Rule 54(d) of the Federal Rules of Civil Procedure generally governs the taxation of costs for the prevailing party in federal district court:

> *Costs Other than Attorneys' Fees.* Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs . . . .

Fed.R.Civ.P. 54(d)(1).

"Construing this provision, the Supreme Court has held that the term 'costs' includes only the specific items enumerated in 28 U.S.C. § 1920. . . ." *Whitfield v. Scully*, 241 F.3d 264, 269 (2d Cir.2001) (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987)); *accord, e.g., United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr.*

*Corp.*, 95 F.3d 153, 171 (2d Cir.1996). Section 1920 provides, in relevant part:

> A judge or clerk of any court of the United States may tax as costs the following:

> .        .        .        .        .

> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

> (3) Fees and disbursements for printing and witnesses;

> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case . . .

28 U.S.C. § 1920.

### A. Transcript Costs

Abady seeks $3,001.50 for the trial transcript. (Dkt. No. 46: Abady 11/24/00 Aff. Ex. A at p. 12.) The trial transcript costs are fully recoverable.

Pursuant to Local Rule 54.1(c):

> *Transcripts.* The cost of any part of the original trial transcript that was necessarily obtained for use in this court or on appeal is taxable. The cost of a transcript of court proceedings prior to or subsequent to trial is taxable only

---

**15.** *See, e.g., Collins v. Montgomery County Bd. of Prison Inspectors,* 176 F.3d 679, 685 (3d Cir.1999) ("[T]he constitutional challenge to the hourly rate limitation provision [is rendered] moot as the hourly rate limitation standing alone would allow [Plaintiff] $30,025.30 in fees, a sum exceeding the $30,000 cap predicated on 150% of the judgment. Consequently, an invalidation of the hourly rate limitation could not enhance the fees allowed for no matter what the hourly rate allowed for [Plaintiff's] attorneys' services the fee cannot exceed $30,000. . . . Therefore, we will not decide whether the hourly rate limitation violates a prisoner's rights to equal protection of the law."), *cert.*

denied, 528 U.S. 1115, 120 S.Ct. 932, 145 L.Ed.2d 811 (2000).

**16.** Because the parties have agreed that "[n]o part of the payment of attorneys fees shall be deducted from the [$15,000.00] payment to plaintiff" (Settlement Agmt. ¶ 6), § 1997e(d)(2)'s provision that "[w]henever a monetary judgment is awarded [in an action subject to the PLRA], a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant" is not applicable.

when authorized in advance or ordered by the court.

S.D.N.Y. Local Civil Rule 54.1(c)(1).

[16, 17] The State argues that the cost is not recoverable because Abady did not obtain prior court authorization. (*See* Dkt. No. 57: State Br. at 48–49.) The State is incorrect. Local Rule 54.1(c)(1) does not require advance court approval for the trial transcript. *See* Local Civil Rule 54.1(c)(1), quoted immediately above. Here, because the trial ended in a hung jury and the Court set a prompt date for a re-trial, the trial transcript was "necessarily obtained," as Local Rule 54.1(c)(1) requires. It therefore is a taxable cost. And to the extent the amount sought includes any other transcripts, this Court ordered the parties to purchase the transcripts. Accordingly, Abady is awarded $3,001.50 for transcript costs.

### B. *Expert Witness Fees*

▮ Abady seeks $9,500 in expert witness fees, for an expert who did not testify at trial. (Dkt. No. 46: Abady 11/24/00 Aff. Ex. A at p. 11.) Those expert witness fees are not recoverable. Local Rule 54.1(c)(3) provides:

> *Witness Fees, Mileage, and Subsistence.* Witness fees and mileage pursuant to 28 U.S.C. § 1821 are taxable if the witness testifies. Subsistence pursuant to 28 U.S.C. § 1821 is taxable if the witness testifies and it is not practical for the witness to return to his or her residence from day to day. No party to the action may receive witness fees, mileage, or subsistence. *Fees for expert witnesses are taxable only to the extent of fees for ordinary witnesses unless prior court approval was obtained.*

S.D.N.Y. Local Civil Rule 54.1(c)(3) (emphasis added).

Carbonell's expert witness, Dr. Jane Watson, did not testify at trial. Therefore,

Abady is not entitled to reimbursement for her fees as an "ordinary witness." Moreover, since the Court did not give prior approval to Abady hiring Dr. Watson, it is "elementary" that her fees as an expert witness are not taxable under Rule 54.1(c)(3).

### C. *Copying Costs*

▮ Abady seeks copying costs of $377.25. (Dkt. No. 46: Abady 11/24/00 Aff. Ex. A at p. 12.)

> Local Rule 54.1(c)(5) provides:
>
> *Exemplifications and Copies of Papers.* A copy of an exhibit is taxable if the original was not available and the copy was used or received in evidence. The cost of copies used for the convenience of counsel or the court are not taxable....

S.D.N.Y. Local Civil Rule 54.1(c)(5).

Abady has not specified what portion, if any, of his copying costs were incurred in creating exhibits that were used at trial or received in evidence. In fact, Abady marked few exhibits at trial. Because the Court has no idea what part of the requested amount is for copies of trial exhibits, as opposed to convenience copying, Abady is not entitled to reimbursement for copying costs.

### D. *Remaining Costs*

▮ The remainder of the costs sought by Abady—parking and taxicab costs; Federal Express, postage, fax and long distance telephone charges; and paralegal costs (Dkt. No. 46: Abady 11/24/00 Aff. Ex. A at pp. 10–12)—are not reimbursable as "costs" pursuant to Federal Rule of Civil Procedure 54 and 28 U.S.C. § 1920. Rather, they are "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients," and as such reimbursable only as part of statuto-

ry attorneys' fees. *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir.1998). Abady's recovery of attorneys' fees, however, is already "capped out" at 150% of the judgment amount and hence these amounts are not recoverable.

## CONCLUSION

For the reasons set forth above, the Court awards plaintiff Carbonell's counsel, Samuel Abady, $22,500.00 in attorneys' fees and $3,001.50 in costs. The Clerk of Court shall enter judgment accordingly. This action is closed.

SO ORDERED.